## Abbie Weston Swern, Executrix, Appellee, v. Durand Churchill et al., Keith Spalding, Appellant.

### Gen. No. 14,895.

1. CONTRACTS—*effect of trade custom.* When a trade, business or professional custom is involved, such custom is not considered to have entered into the contracts of others than those in the particular trade, business or profession, those shown to have had actual knowledge of the custom and those shown to have had previous transactions or a course of dealings of such nature that knowledge, on their part, of the custom may be presumed.

2. CONTRACTS—*effect of local custom.* When a territorial or local custom is involved it is regarded to have entered into the contracts of those domiciled in the locality and perhaps of those who are permanently engaged in business in the locality where the custom exists.

3. CONTRACTS—*how knowledge of custom established.* Facts and circumstances may be shown which raise a presumption of knowledge of the existence of a custom alleged to have been a part of the contract.

4. CONTRACTS—*what customs affect.* A usage or practice, in order to have a standing in law as a custom, must be uniform within some sphere; it must also be long established and generally acquiesced in.

5. CONTRACTS—*what rules do not amount to customs.* The rules and enactments of voluntary organizations in a business, trade or occupation, such, for instance, as the American Institute of Architects, are neither law nor custom and cannot be permitted to have the force and effect of such upon the community. They are valid and binding upon their members but cannot, as such rules and enactments, be made use of in courts to affect the rights of others than the members.

6. ARCHITECTS—*appropriate method of proving value of services of.* In order to show the value of architect's services evidence should be adduced of the usual and customary charge for the particular services described and detailed.

Assumpsit. Appeal from the Municipal Court of Chicago; the Hon. WILLIAM N. GEMMILL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1908. Reversed and remanded. Opinion filed March 18, 1910. Rehearing denied May 3, 1910; additional opinion filed.

CHARLES T. FARSON and GARDNER, STERN & ANDERSON, for appellant, KEITH SPALDING.

HOLLETT, SAUTER & HENKEL, for appellee.

MR. PRESIDING JUSTICE CHYTRAUS delivered the opinion of the court.

Plaintiff below, appellee here, brought an action of assumpsit against Durand Churchill and Keith Spalding to recover for services rendered as architect by testator, William C. Swern, her deceased husband. Only the defendant Spalding was served and a judgment for $1,455 was recovered against him. He prosecutes this appeal to reverse that judgment. The cause was tried upon the theory that, without any agreement as to the amount to be paid for the services, there was an agreement or understanding between decedent and Churchill & Spalding that decedent should prepare preliminary sketches, plans, detail drawings and specifications and superintend the construction of a certain factory building and some appurtenant structures for defendants, in Chicago. Churchill & Spalding were engaged in business in Chicago as manufacturers of sheet steel lockers. Before the construction began, Churchill, who seems to have had sole charge of the matter of the building for the firm, became very seriously ill and continued ill for a long time and, during his illness, Swern died. Consequently the construction appears to have been abandoned either during the taking of bids or immediately after the bids had been received.

Plaintiff undertook to establish her case by proof that there was a settled usage and custom which fixed 5% on the total cost of a building, including fixtures, as the amount an architect would be entitled to receive for his services in preparing preliminary sketches, plans, detailed drawings and specifications and superintending the construction of the building; and, furthermore, that it was settled and established, as a usage and custom, that the architect was entitled to 3½% of such cost for his services, where the work was stopped or abandoned without going on with the construction.

of the building after the architect had prepared the preliminary sketches, plans, detailed drawings and specifications and had taken bids of contractors for the work. This line of proof was, of course, in disregard of what was the reasonable value of the particular services rendered by the architect in this particular instance. It is not perfectly clear, at least not from the testimony of Mahler, plaintiff's first witness upon this phase of the case, whether it was plaintiff's idea to establish a usage and custom in the profession of architects or a territorial or local usage and custom. When a trade, business or profession custom is involved, such custom is not considered to have entered into the contracts of others than those in the particular trade, business or profession, those shown to have had actual knowledge of the custom and those shown to have had previous transactions or a course of dealings of such nature that knowledge, on their part, of the custom may be presumed. When a territorial or local custom is involved it is regarded to have entered into the contracts of those domiciled in the locality and perhaps of those who are permanently engaged in business in the locality where the custom exists. The doctrine that usage and custom affect contracts "rests, except in particular instances, solely upon the theory that the parties in entering into the compact had such usage in mind, stipulated with reference to it, and, hence, made it a part of their contract". Germ. Am. Ins. Co. v. Commercial F. Ins. Co., 95 Ala. 469, 474. If a usage is special and confined to a particular business or has reference to a particular port only, there is no presumption that both parties had knowledge of it and contracted with reference to it. Isáksson v. Williams, 26 Fed. 642, 645. To the same effect, Van Hoesen v. Cameron, 54 Mich. 609, 614. True, a person who deals in a particular market must be regarded as dealing according to the general and uniform usage and custom of that market, in respect to days of delivery and otherwise, and as having knowledge thereof;

but this rule does not apply to one having but a single transaction with a member of a profession, of which he is not himself a member, wherein exists a usage or custom by which it is sought to charge him on the ground it entered into his contract.

When shown to exist, a particular usage and custom has the force of law within the sphere where established. An established usage and custom enters into the contracts of those within its sphere who are shown to know of its existence. Facts and circumstances may be shown which raise a presumption of knowledge of the existence of the usage and custom. A usage or practice, in order to have a standing in law as a custom, must be uniform within some sphere. It must also be long established and generally acquiesced in. Packer v. Pentecost, 50 Ill. App. 228, and cases there cited. "A custom is something which has the force and effect of law; is law by the usage and consent of the people. But it must be uniform and universal within the sphere of its action and so ancient 'that the memory of man runneth not to the contrary.'" Hursh v. North, 40 Pa. St. 241, 243. A practice and usage in order to have become an established custom must have been uniformly acquiesced in; for, as customs owe their origin to common consent, lack of uniform acquiescence shows the want of such consent.

The evidence in the case at bar fails to establish any custom with reference to fees for architects' services. Plaintiff's first witness, Mahler, testified that there was a "well known" custom among architects fixing 5% of the total cost when the services included superintendence of the construction and the custom fixed 3½% of the total cost when superintendence is not included. Upon cross-examination he testified that a certain Chicago association of architects had slightly different rates, and that quite a number of architects in this city were "guided" by these rates. He also testified upon cross-examination that the rates here were uniform for all classes of buildings, the minimum uni-

versal rate being 5%, and that the rate upon some buildings may be 10%; that, dependent upon inspection, engineering or something of that character, that is, dependent upon "the particular job," the rate, exclusive of the superintendence, might be more than $3\frac{1}{2}$% and that he knew it was a rule with the architects of the Chicago association to charge three-fifths of the original agreed price when excluding superintendence. Beaumont, plaintiff's other witness, testified that there was a custom in Chicago in regard to fees for architects' services of the kind here involved, and that exclusive of superintendence it was three-fifths of the commission agreed upon for the whole work. Upon cross-examination he said that there was no absolute customary or uniform rate of 5% on all buildings; that it was a custom to make a distinction between different kinds of buildings; that upon residence buildings architects would receive from 7% to 10%; that while he himself had a fixed rate of 5% as a minimum charge for factory buildings he knew that the members of a certain Chicago association of architects had a fixed rate of 4% as a minimum and that a number of architects would take factory buildings at a minimum rate of 4%. He also testified that in this case he "fixed the rate in a general way, not knowing the circumstances of this building"; that, "if this was a building requiring a great deal of expert knowledge on the part of the architect, then, certainly, 5% would be a minimum charge" (meaning, of course, inclusive of superintendence); that "I estimated it would be worth 5% because of the fact that the architect found it necessary to send a draftsman to the office of the proposed owner of the building to get all these preliminaries, which showed to me that it must be a building of rather unusual conditions, or it would not be necessary to send a draftsman to get all that information." At the close of the plaintiff's case the foregoing evidence was all the evidence in the case as to custom fixing charges for architects' services.

For the purpose of destroying plaintiff's theory of the 5% and 3½% custom defendant called as witnesses two architects. The first, Wheelock, testified that there was a *tolerably* uniform custom or usage with respect to architects' charges or fees and that factory buildings were rated the lowest. Being asked whether, in respect to factory buildings, there was any fixed and uniform rate of charge "according to the practice of architects", he answered: "I should not say there was a fixed charge—no. There was a customary charge." This customary and usual charge he fixed at 4% including the superintendence and at three-fifths of 4% of the cost of the building excluding the superintendence. Defendant's other witness, Youngberg, testified that there was distinction in architects' charges in the different kinds of buildings, that is, between residence buildings, factory buildings and office buildings and furniture and decorations. He fixes the usual and customary charge including superintendence at 4% and excluding superintendence at three-fifths of the entire fee. No other evidence as to custom was introduced.

This evidence falls far short of establishing a custom, i. e., a practice and usage uniformly acquiesced in and long established, of which defendant had actual knowledge or of which he could be fairly chargeable with having knowledge, so that it entered into and became a part of his contract.

The rules and enactments of voluntary organizations in a business, trade or occupation, such, for instance, as the American Institute of Architects, are neither law nor custom and cannot be permitted to have the force and effect of such upon the community. They are valid and binding upon their members but cannot, as such rules and enactments, be made use of in courts to affect the rights of others than the members. The use made of the rules and enactments of the American Institute of Architects before the jury would undoubtedly have been prejudicial error but for the acquiescence of the defendant in several instances.

It is contended on behalf of plaintiff that there was no objection made to the evidence introduced to prove a custom. The difficulty here is not that evidence relative to custom and usage was incompetent and therefore inadmissible. The difficulty is that the evidence is wholly insufficient to prove any custom in regard to the subject-matter relating to which it was sought to establish a custom. The question of the insufficiency of the evidence was properly raised by defendant's motion for a peremptory instruction at the close of the plaintiff's case. The learned trial judge erred in denying that motion. The defendant raised the question of the insufficiency of the whole evidence to sustain a verdict for the plaintiff by a motion for a peremptory instruction at the close of the defendant's case. This motion should have been allowed. For the errors indicated the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Upon a petition for rehearing MR. PRESIDING JUSTICE CHYTRAUS delivered the following opinion of the court:

Appellee's counsel conceive that there is a conflict of decision in Packer v. Pentecost, 50 Ill. App. 228, and the line of cases holding as do L., N. A. & C. Ry. Co. v. Wallace, 136 Ill. 87; Stone v. Billings, 63 Ill. App. 371; Nathan Brand, 67 Ill. App. 541; S. C. 167 Ill. 608, and other cases. We see no such conflict. Packer v. Pentecost was an appeal from a judgment for $1,000 rendered in favor of an architect upon the basis that two per cent. on the cost of a residence building was the customary charge among architects for preparing the plans therefor. For some undisclosed reason the plans involved in that case were not used. There was no express agreement as to the amount of compensation to be paid for preparing the plans. Plaintiff's theory was that in the profession of architects there was a uniform custom, long established, generally acquiesced in and so well known as to induce the belief

that parties in contracting for the preparation of plans had in mind the custom and contracted with reference thereto, so that, consequently, the custom became a part of every such contract, and that the custom fixed two per cent. of the cost of the building as the regular and universal compensation, in all instances, for the preparation of plans for a residence building. That is, that this would be the compensation whether the making of the plans required took a long time and required the greatest skill and long experience or took only the shortest time and little or no skill or experience. The case was tried upon that theory. That theory involves the idea that it is unnecessary to particularize the services rendered or to show, by evidence of the usual and customary charges, or other evidence, the reasonable worth or value of the particular services rendered in any particular case. The witnesses in the Pentecost case, as we understand it, were merely asked, generally, what the usual and customary charge was for preparing plans for a residence building, that is, plaintiff merely sought to establish a general custom, which would be a part of the contract and would determine the compensation at two per cent. of the cost of the building for which the plans were prepared. The witnesses were not asked, as experts who by reason of practice and long experience would know, what was the usual and customary charge for particular services described, detailed and specified in their hearing in the evidence or in hypothetical questions put to them. Evidence so adduced of the usual and customary charge for particular services described and detailed would tend to prove the reasonable worth and value of particular services rendered; but a party introducing evidence in that manner would not be proving a custom fixing a definite percentage of the cost of a building as the compensation in all such instances.

In L., N. A. & C. Ry. Co. v. Wallace, as in other cases of that class, the plaintiff introduced evidence showing what particular legal services he had rendered, and

then he called witnesses, who had been present and heard the services described and detailed in the evidence given in their presence, to establish value, and they were asked to testify as to the value of those described and detailed services. This was not as if plaintiff had shown that he had conducted to conclusion a foreclosure of mortgage involving a certain amount and then called witnesses to prove that, in the legal profession, there was a universal custom fixing a certain per cent. upon the amount of the mortgage indebtedness as the fee of the solicitor in mortgage foreclosures, regardless of the reasonableness, the actual services rendered or the difficulties in the particular case. Had such proof of a custom been made in the L., N. A. & C. Ry. Co. v. Wallace case, then the legal proposition presented in that case would have been the same as in the Packer v. Pentecost case. As the facts are the cases may readily be differentiated. We find no inconsistency in the two lines of cases. We cannot agree with the argument of the plaintiff herein that the L., N. A. & C. Ry. Co. v. Wallace line of cases overrules Packer v. Pentecost.

In the Packer case it was held, as we have already held and do now hold in the case at bar, that the plaintiff failed to establish the fundamental fact involved, namely, that there was such custom as plaintiff by the theory of his case contended for.

That the theory of the plaintiff's case in the case at bar was to establish a universal custom, and not to establish the reasonable worth or value of the services rendered, is most readily ascertained from plaintiff's examination of his own witnesses on this subject of amount of compensation. Inspection of that examination and the testimony of his witnesses disclose most clearly that plaintiff did not seek to prove by his witnesses what the reasonable worth and value of the particular services rendered were, that is, what the usual and customary charge was for particular described, detailed and specified professional services.

The plaintiff failed totally in establishing a universal custom as to a definite percentage.

When rendering the opinion herein we were misled, by defendant's 12th point in his motion for a new trial, as it appears in the abstract of record, into believing that defendant had asked for a peremptory instruction in his favor at the close of all evidence. The petition and the testimony of his witnesses disclose most The defendant accomplished the same result, however, so far as raising the question of the insufficiency of the evidence to sustain the verdict and judgment is concerned, by filing a written motion in the trial court for a new trial, which motion included among other grounds one that the verdict was contrary to the evidence in the case.

The petition for a rehearing must be denied.

*Petition denied.*